IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. BRYAN JAMES GARDNER, Defendant. | ORDER AND MEMORANDUM DECISION Case No. 2:10-CR-551-TC |

Defendant Bryan James Gardner was indicted for possession of child pornography.  He

has moved for an order suppressing incriminating statements he made on January 21, 2010, to

two parole officers during their routine visit to and search of his home.  Mr. Gardner contends

that the statements must be suppressed because he made them during a custodial interrogation

without benefit of the warning required by <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), and the

statements were not voluntarily made.  Because the court finds that Mr. Gardner's statement to

the first parole officer was spontaneous and voluntary and that Mr. Gardner's statements to

the second parole officer were voluntary but obtained in violation of <u>Miranda</u>, Mr. Gardner's motion

to suppress is GRANTED IN PART AND DENIED IN PART.

## FACTUAL BACKGROUND

The court held evidentiary hearings on January 4, 2012, and January 12, 2012.  The facts

are taken from testimony and evidence admitted during those hearings  (See Tr. of Jan. 4, 2012

Evidentiary Hr'g (ECF No. 55) [hereinafter "First Tr."]; Tr. of Jan. 12, 2012 Evidentiary Hr'g

(ECF No. 56) [hereinafter "Second Tr."].)

During the evidentiary hearings, the Government presented the testimony of two parole officers, Agent Frank Davis and Agent Ian Adams. Mr. Gardner also testified during the hearing.

On some principal issues, Mr. Gardner's testimony directly contradicted the testimony of Agent Adams and Agent Davis. Having evaluated the demeanor of the witnesses and the contents of their testimony, the court finds, for reasons set forth below, that the agents's testimony, not Mr. Gardner's testimony, is credible.

### The January 21, 2010 Field Visit

In January 2010, Defendant Bryan James Gardner was on parole from the Utah State Prison where he had been incarcerated after his conviction for possessing child pornography. Agent Frank Davis, a parole officer from the Utah Department of Corrections Division of Adult Probation and Parole (APP), was assigned to supervise Mr. Gardner. On a monthly basis, as part of his duties, Agent Davis visited Mr. Gardner at his home. During a home visit (referred to as a "field visit"), the agent typically conducts a search of the parolee's living quarters, checks on the welfare of the parolee, and makes sure the parolee is following the orders of the Board of Pardons. (See First Tr. at 7-8.) APP Agent Ian Adams (Agent Davis's partner) accompanied Agent Davis and served as a back-up officer during the routine visits to Mr. Gardner's home.

The Agents's Arrival at the Home

On January 21, 2010, about 8:30 p.m., Agents Davis and Adams conducted a field visit to Mr. Gardner's home. The agents knocked on the door and were greeted by Mr. Gardner's father. Mr. Gardner, who lives with his parents, was in his bedroom in the basement. Mr. Gardner's father led the agents downstairs to Mr. Gardner's room. When they knocked on the closed

bedroom door, Mr. Gardner told them to come in.  He was on the phone but hung up when they arrived.

The introductory conversation between Agent Davis and Mr. Gardner was informal and cordial.  According to Agent Adams, it was "just generic pleasantries, hello.  This was very, very normal for us to do. . . . We were used to seeing him in his bedroom.  We'd been there many times, so, 'Hello, how are you? What are you doing?' That sort of thing."  (Second Tr. at 7.)  This was one of about twenty visits the agents had conducted at Mr. Gardner's home, and all involved were familiar with the routine.[1]

Agent Davis said, "I asked him how he was doing.  He said that he was fine.  I then asked him if he had anything in his room that he shouldn't have, and he said, 'No, I don't have anything I shouldn't have.  You can look anywhere.'"  (First Tr. at 10.)  Agent Davis began searching the room[2] while Agent Adams stood by watching Mr. Gardner.  Agent Adams testified that his job during field visits was "to protect Agent Davis while he's conducting searches or conversations or – you know, a lot of times he has to turn his back on an offender.  My job is to maintain cover for him basically."  (Second Tr. at 7.)

---

[1]Defense counsel elicited testimony from Agent Adams that at the time of the field visit he was aware of a Utah Internet Crimes Against Children (ICAC) Task Force investigation focused on Mr. Gardner.  The extent of his understanding and knowledge of the investigation was not explored.  Based on how Agent Adams testified, the court is left with the impression that Agent Adams had very general information and that the existence of the investigation had no bearing on the agents's visit to Mr. Gardner.  (See Second Tr. at 20-21.)

[2]Because Mr. Gardner was a parolee, the agents had authority to search his room with or without his consent.  (See Second Tr. at 7-8 ("[Mr. Gardner] was a state parolee.  Underneath the parole agreement it's a zero cause search.  In other words, we don't need reasonable cause or reasonable suspicion to conduct the search.  However, our routine was to still ask.").)

The Search and Agent Adams' Alleged Interrogation of Mr. Gardner

During the search, a black and white bound notebook on a television stand caught Agent Davis's attention because, when he "opened it and looked through some of the pages," he saw "instructions on how to hook up a computer to recording devices," computer search terms related to child pornography, lists of youth activities in the community, and the directions and addresses of skate parks in the community.  (First Tr. at 10-11.)  These were of interest because, under Mr. Gardner's parole conditions, he was not allowed to go any place children were expected to congregate.  Agent Davis also knew that Mr. Gardner had recently violated parole by attending the same BMX bike race his previous victim had attended.

At that point, Agent Davis, who had not said anything to either Mr. Gardner or Agent Adams about what he found in the notebook, gave Agent Adams a non-verbal signal (tapping his wrists together) to handcuff Mr. Gardner.  Agent Adams handcuffed Mr. Gardner and took him upstairs to the outside front porch.  Mr. Gardner did not resist.

Agent Adams knew nothing about the contents of the notebook when he took Mr. Gardner into custody in the bedroom and escorted him upstairs to the front porch.  (See Second Tr. at 27 ("Q. Did you ever actually look at the notebook that had the [website addresses] written in it?  A. [by Agent Adams] No."), and at 35 ("Q. At what point was it that you told Agent Adams about the contents of the notebook?  A. [by Agent Davis] I believe I gave him a very brief synopsis of what was in the notebook when I came out after speaking with Mr. Gardner's father. ... I don't believe I showed it to him while I was in the room.").)[3]

_____

[3]Upon questioning by defense counsel, Agent Davis said he could not remember for sure whether and when he showed Agent Adams the notebook.  (See Second Tr. at 35-36.)  This

Mr. Gardner and Agent Adams went upstairs to the front porch to wait for Agent Davis. Because Mr. Gardner was not wearing shoes, Agent Adams called into the house asking for someone to bring Mr. Gardner's shoes out.

While Agent Adams was putting shoes on Mr. Gardner, Mr. Gardner, who was upset, started a conversation with Agent Adams, saying, "Ian, I'm scared. What's going on?" (Second Tr. at 12, 14.) Agent Adams responded, "Bryan, I don't know. You would know better than me." (Id.) Mr. Gardner paused, and then said, "Well, I looked at some porn. Do you think that could be it?" (Id. at 13.) Agent Adams testified that he said , "'Yeah, that could very well be it, Bryan.'" (Id. at 14.) Then Agent Adams said "'Frank's the one inside. You're just going to have to wait for him to [ask] what he's doing.'" (Id.)

During the hearing, the government asked what else was said while they were on the porch:

> Q     Did you have any further conversation with Mr. Gardner while you were waiting for Frank?
>
> A     Yeah. There was an incidental conversation. He would continue to ask me questions, "Am I going to prison tonight? What's happening?" That sort of thing.
>
> Q     And what were your responses to those questions?
>
> A     That I didn't know. Until the point where I did know he was going to prison, at which point, "Yes, you're going to prison tonight, and you'll be transported by these two officers."
>
> Q     Okay. At what point did you become aware of that?

_____

testimony is not inconsistent with Agent Adams's testimony and nothing in the record contradicts Agent Adams's testimony that he did not know anything about the notebook's contents while he had Mr. Gardner in custody.

A        Frank came out 10 to 15 minutes – you know, shortly after and said that
         . . . Bryan Gardner was going to be going to prison and could I arrange for
         that.

Q        Okay. Up until that point you really didn't know?

A        No.

Q        <u>Did you at any point during this 15 minutes ask Mr. Gardner any
         questions?</u>

A        Not that I'm – <u>no.</u>  I was very aware of my position at that point, and that
         not – that there was something going on.  And I've been in situations in
         my career as a law enforcement, especially as a young officer, where I had
         screwed something up by talking to – by basically speaking out of role.
         And I had learned that lesson the hard way several years before.  I did not
         – I mean my general role and purpose as a backing officer is exactly that.
         It's very minimal.  You don't want to screw something up by asking the
         wrong question at the wrong time or taking certain facts into assumption
         that turn out not to be true.

(Second Tr. at 14-15 (emphasis added).)  Agent Adams also testified that Mr. Gardner did not

make any comments to him about the websites listed in the notebook.

<u>Agent Davis's Questioning of Mr. Gardner</u>

        After Agent Davis finished his search, he joined Agent Adams and Mr. Gardner.  Agent

Adams told Agent Davis "that Mr. Gardner had admitted to looking at child pornography on the

computer."[4]  (First Tr. at 13.)

        Agent Davis then questioned Mr. Gardner about the contents of the notebook and Mr.

Gardner's recent activities.  Mr. Gardner was still handcuffed and did not receive a <u>Miranda</u>

warning.  The conversation, which was held on or near the front porch, lasted approximately five

---

        [4]Mr. Gardner contends that he said only "porn," not "child pornography."  The nature of
the admission is a fact issue for the jury and the court will not address it here.

6

minutes and the "tone of this five minute conversation" was "calm, congenial" with no raised voices, no yelling, no "emotional exchanges," no "crying, anger[.]" (Id. at 14.)

As Agent Davis testified, "I asked Mr. Gardner if he had viewed pornography on the computer. He said that he had. I asked him how he was doing it basically. He said that he was trying to encrypt it. I asked for the password. He gave me the password to the encryption." (Id. at 15.) Mr. Gardner also said he had looked at child pornography as recently as August 2009.

About five minutes into Agent Davis's questioning of Mr. Gardner, two officers arrived at the home to transfer Mr. Gardner to the prison. Agent Davis said that he did not give a probable cause statement to the two officers; he just asked them to transport Mr. Gardner to the prison and place a 72-hour hold on him. According to Agent Adams, he thought he heard Agent Davis give a probable cause statement to the transporting officers, but he could not be sure.

Mr. Gardner's Testimony

Mr. Gardner's recollection of events differed dramatically from Agent Adams's and Agent Davis's recollection. Mr. Gardner testified that Agent Adams questioned him extensively and threatened him with prison if he did not confess. He also said that he never had a conversation with Agent Davis after their initial conversation in the bedroom. (See Second Tr. at 52.)

According to Mr. Gardner, after a few minutes of sitting on the front porch (where, he says, no substantive conversation occurred), Agent Adams placed him in the backseat of the parole officers's car and interrogated him while standing just outside the open car door. According to Mr. Gardner, Agent Adams first told him that if Mr. Gardner did not tell Agent Adams what was in the notebook that his parole would be revoked and he would go back to

7

prison.  He says Agent Adams questioned him about the websites listed in the notebook, asking

whether Mr. Gardner had been looking up the websites, what was he doing with those websites

in the notebook, and whether he tried to look them up on the family computer.

> Q      When [Agent Adams] asked you what you were doing with those
>        websites, what did you tell him initially?
>
> A      At least a dozen times I had nothing to do with those websites, and I did
>        not even realize they were still in that notebook tablet.
>
> Q      Did you tell him how they got in the notebook tablet?
>
> A      Yes, I did.
>
> Q      What did you tell him?
>
> A      Back in the year 2004 I had initially written down those websites in the
>        notebook tablet. . . . [and that I] had not touched that notebook tablet for
>        six years.  I did not even know they were still in the tablet on the night
>        they came to my house.

(Second Tr. at 42.)

But then, according to Mr. Gardner, Agent Adams "repeatedly called [him] a liar and told

[him] that he did not believe [him]."  (Id. at 44.)  After denying Agent Adams' alleged

accusations a "dozen times," Mr. Gardner changed his story and said he had looked up the

websites.  (Id.)  He said he changed his story because he was "under the threat of being brought

back to prison and having my parole revoked."  (Id.)  After his purported statements, he said

Agent Adams removed him from the car when the transporting officers arrived.

### Reconciling Conflicting Testimony

Because the court finds that Mr. Gardner was not a credible witness, the court adopts the

version of events presented by Agents Davis and Adams.  The court notes that Mr. Gardner, who

8

is being prosecuted for a federal crime, has an inherent motive to protect himself.  More importantly, Mr. Gardner's testimony was less than credible given its delivery and its content.

From the beginning of Mr. Gardner's testimony, it was apparent that he had an agenda. When he first took the stand, his attorney said to him, "Would you turn towards the judge so she can evaluate you."  (Second Tr. at 38.)  Mr. Gardner did as he was instructed.  This unusual effort to bolster Mr. Gardner's credibility seemed somewhat manufactured, although the court recognizes that Mr. Gardner's attorney may have wished to emphasize Mr. Gardner's "openness" given that he was about to contradict an officer's testimony.

Further, when Mr. Gardner's attorney asked him what Agent Adams allegedly said in the car, Mr. Gardner launched into a non-responsive answer accusing Agent Adams of coercing him into confessing.  Despite defense counsel's efforts to rein him in, Mr. Gardner repeated the story he wanted the court to hear.  The following colloquy occurred:

> Q      What did [Agent Adams first] say to you [in the car]?
>
> A      I was repeatedly questioned about —
>
> Q      No, no, no.  Don't give us the narrative about repeatedly.  The question was what did he say to you?
>
> A      I was questioned about that –
>
> Q      No, no.  Let's start again here.  What did Agent Adams say to you?  What were the words that came out of his mouth?
>
> A      The very first thing was about what was in the notebook.
>
> Q      Just to the best of your recollection tell the judge the words that he – that he uttered from his mouth.
>
> A      Kept asking me, "What are these? What are these websites? What did you do with these websites?"

9

Q      And so back to my original question.  What was the first thing that he said
       to you.

A      I was told if I did not tell him –

Q      No, no Mr. Gardner.

A      Okay. I was told –

Q      No. Let me just ask the question again.  The first thing that came out of
       Agent Adams' mouth while you're sitting in the car, specifically what
       were his words?

(Second Tr. at 40-41.)  At that point, Mr. Gardner finally answered the question. "[He said] if I

do not tell him what was in that notebook tablet, I was having my parole revoked and I was going

to be sent back to prison."  (Id. at 41.)

       Certainly a direct examination is designed to elicit specific information, but the validity

of the information presented by Mr. Gardner was undermined by the manner in which he

delivered it and by the uncontroverted evidence that Agent Adams had not seen the contents of

the notebook at that point and so could not have known that websites were listed in it (much less

which ones).  The fact that Agent Adams had some general knowledge about an investigation

into Mr. Gardner's alleged child pornography activities does not suggest that he had the

knowledge necessary to ask "What are these? What are these websites? What did you do with

these websites?" as Mr. Gardner contends.  Nothing about the notebook's appearance would have

revealed its contents, and the fact that it would found on a TV stand would not have aided Agent

Adams in guessing its contents.

       To find that Mr. Gardner was telling the truth, the court would need to find that both

agents were lying.  But nothing in the record indicates that either agent had a motive to lie.  And

nothing about their testimony or the facts to which they testified was inflamed.  Their demeanor

was open and honest.  Both candidly admitted that they did not remember certain details.

Mr. Gardner tries to use the less-than-perfect memory of the agents to discredit them.  He

emphasizes that they could not recall certain details, such as who knocked on the front door,

what clothing individuals were wearing during the field visit, and whether Mr. Gardner's father

wore eyeglasses.  (See Mem. Supp. Mot. Suppress (ECF No. 63) at 3.)  But those details are

immaterial.  He also emphasizes the discrepancy between Agent Adams's and Agent Davis's

testimony about whether a probable cause statement was given.  Upon review of the transcript,

the court finds that the discrepancy does not support a conclusion that Agent Adams was lying,

but rather that he did not recall something that, in this context, is irrelevant.  Agent Adams

admitted that he could not remember exactly what happened.  And because Agent Adams was

acting in a backup role, it is unlikely that he would take the lead and be as aggressive as Mr.

Gardner suggested, especially given the cautionary stance he takes in his role as the secondary

agent during a field visit.  (See Second Tr. at 15.)

In short, Mr. Gardner's point about the haziness of the agents's memories is not

particularly probative.

For all the foregoing reasons, the court credits the agents's testimony rather than Mr.

Gardner's.

## ANALYSIS

In light of the court's factual findings[5] and the Government's concessions,[6] two issues

remain: (1) whether Agent Adams interrogated Mr. Gardner on the front porch; and (2) whether

Mr. Gardner's statements to Agent Adams and Agent Davis were voluntary.

### Statement on the Front Porch

When Agent Adams and Mr. Gardner first arrived on the front porch, Mr. Gardner said,

"Ian, I'm scared. What's going on?"  (Second Tr. at 12, 14.)  Agent Adams responded, "Bryan, I

don't know. You would know better than me."  (Id.)  Mr. Gardner paused, and then said, "Well, I

looked at some porn.  Do you think that could be it?"  (Id. at 13.)

Mr. Gardner contends that his statement should be suppressed because Agent Adams's

response to Mr. Gardner's question was reasonably likely to elicit an incriminating response from

Mr. Gardner.  In response, the Government maintains that Mr. Gardner's statement on the front

porch is admissible because it was spontaneous (that is, not made in response to questioning).

The Government concedes that Mr. Gardner was in custody and was not given a warning

under Miranda v. Arizona, 384 U.S. 436 (1966).  But the court agrees that Mr. Gardner's

statement is admissible because it was "given freely and voluntarily without any compelling

influences[.]" Id.  In other words, it was not a response to any interrogation.

---

[5]The Government does not intend to introduce the alleged statements Mr. Gardner claims
to have made in the car, because it contends no such statements were ever made.  Based on the
court's credibility determination, the court agrees that an analysis of the admissibility of the
alleged confession is not required.

[6]In Mr. Gardner's Motion to Suppress, he raised the issue of whether he was in custody
during questioning and whether he had received a Miranda warning.  The Government concedes
that Mr. Gardner was in custody from the time he was handcuffed by Agent Adams and that he
was never given a Miranda warning.

The United States Supreme Court defined "interrogation" as express questioning or "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980).  Agent Adams did not expressly ask Mr. Gardner any question during the custody, so the issue is whether Agent Adams's statement "I don't know. You would know better than me" was the functional equivalent of interrogation.

The situation here is innocuous compared to the situation in Innis, where the United States Supreme Court held that the officers's statements about concerns that a handicapped child would find the firearm used in the crime were not the functional equivalent of an interrogation. The Innis court held that the officers had no reason to know that their conversation would prompt Mr. Innis to show the officers where the firearm was located.

Here, Mr. Gardner started the conversation.  Agent Adams was responding to Mr. Gardner's question.  Nothing in the record shows that Agent Adams had any knowledge of the notebook's contents, and nothing about his answer seems calculated to obtain a confession from Mr. Gardner.  Instead, the record supports the finding that Agent Adams was being as honest and non-committal to Mr. Gardner as possible.  For these reasons, the court finds that Agent Adams's response to Mr. Gardner's question was not reasonably likely to elicit an incriminating response from Mr. Gardner.

**Voluntariness of Mr. Gardner's Statements**

Mr. Gardner contends that any statement he made was not voluntary, citing to his testimony to support his position.  But, as the court found above, the alleged questioning and

bullying in the car did not occur and the conversation between Agent Davis and Mr. Gardner did take place.  To some extent, the court's factual findings moot Mr. Gardner's argument, but for the sake of completeness, the court analyzes the circumstances under the applicable legal standard and finds that Mr. Gardner made the statements to Agents Davis and Adams without coercion.

The test to determine whether a confession was voluntary "is whether, considering the totality of the circumstances, the government obtained the statements by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." United States v. Erving L., 147 F.3d 1240, 1248-49 (10th Cir. 1998).  The court considers both the defendant's characteristics and the circumstances surrounding the defendant's statement. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).  "[C]oercive policy activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."  Colorado v. Connelly, 479 U.S. 157, 167 (1986).  To analyze voluntariness, the court must consider the following factors: "'(1) the age, intelligence, and education of the defendant; (2) the length of [any] detention; (3) the length and nature of the questioning; (4) whether defendant was advised of [his] constitutional rights; and (5) whether the defendant was subjected to physical punishment."  United States v. Rith, 164 F.3d 1323, 1333 (10th Cir. 1999) (quoting United States v. Glover, 104 F.3d 1570, 1579 (10th Cir. 1997)).

The Statement to Agent Adams

As previously noted, Mr. Gardner did not make his statement to Agent Adams in response to questioning.  There is nothing remarkable about Mr. Gardner's age or intelligence.

14

The length of detention before Mr. Gardner made the statement was very short.  And there is no evidence of any physical punishment.  Because nothing about Agent Adams's interaction with Mr. Gardner on the porch could be considered coercive, his statement to Agent Adams is admissible.

<u>The Statements to Agent Davis</u>

The Government does not intend to introduce the statements Mr. Gardner made to Agent Davis as evidence during the government's case in chief.  But it contends that it should be allowed to use the statements Mr. Gardner made to Agent Davis as impeachment because the statements were made voluntarily.  The court agrees.

"Despite the fact that patently <u>voluntary</u> statements taken in violation of <u>Miranda</u> must be excluded from the prosecution's case, the presumption of coercion does not bar their use for impeachment purposes on cross-examination."  <u>Oregon v. Elstad</u>, 470 U.S. 298, 307 (1985) (emphasis in original).  "[T]he primary criterion of admissibility [of such statements remains] the old due process voluntariness test."  <u>Id.</u> at 307-08 (internal quotation marks and citation omitted).

To determine admissibility, the court considers the factors articulated in <u>Rith</u>, as set forth above.  Applying the <u>Rith</u> factors to Mr. Gardner's conversation with Agent Davis, the court finds that the statements were voluntary.  Again, there is nothing remarkable about Mr. Gardner's age or intelligence.  The length of time Mr. Gardner was detained before Agent Davis spoke to him was ten to fifteen minutes.  Although Agent Davis did question Mr. Gardner without giving a <u>Miranda</u> warning, the questioning lasted five minutes.  The nature of the conversation was calm, and Mr. Davis was not subjected to physical punishment.  For all these reasons, the court finds that Mr. Gardner's statements are admissible as impeachment on cross-examination.

**ORDER**

For the foregoing reasons, Defendant Bryan James Gardner's Motion to Suppress (ECF

No. 45) is GRANTED IN PART AND DENIED IN PART.

DATED this 12th day of April, 2012.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge